Next case for argument is United States v. Davis Thank you very much. Good morning, your honors. Devin Burstein on behalf of Perry Davis. We are not going to be talking about courts of entry, I promise. So in this case, the district court committed two prejudicial evidentiary errors. First, in contravention of the court's en banc decision in Curtin, it allowed the government to play for the jury disturbing footage of Mr. Chambers' overdose and death without first watching the video. Second, in contravention of the hearsay rules, the court erroneously admitted Mr. Chambers' hearsay text messages for the truth of the matter asserted under a flawed party-opponent theory without eliminating instruction. When the district court commits such evidentiary errors, this court begins, quote, with the presumption of prejudice, which the government can rebut only by showing it is more probable than not that the jury would have reached the same The hearsay text messages were a crucial linchpin in the government's proof, and the video would naturally trigger the jurors' sympathies and passions. In short, this court cannot be sure that these errors, whether considered collectively or independently, did not play at least some part in the court's verdict. And, of course, one juror is all it takes for a different result. Moving first to the issue of the video. In Curtin, can you help me understand, just in terms of how the proceedings went below, how this video could have been shown, what was the judge asked to view it, what happened, how did it come about that a video was shown to the jury that the judge had never seen it? Because the judge accepted the government's proffer as to what it showed. There was an eliminate motion practice about whether to exclude it or not. He moved to exclude it. Right. The government said... The government moved to introduce it. We said no, it was prejudicial under 403, it shouldn't have been admitted. The district judge basically said, what's your proffer? The government, the trial lawyer, proffered. What did the trial lawyer say? The trial lawyer said, this is a trial, prosecutor said, it's not gory footage. Our expert relied on it. It shows the collapse. He says it's critical for us. And the judge says, okay, well, if your expert relied on it, I'm going to let it in. That's the essential nature of what happened. That clearly violates Curtin. I mean, there should be, I think, no dispute on that. To quote Curtin, we hold as a matter of law that a court does not properly exercise its balancing discretion under rule 403 when it fails to place on the scales and personally examine and evaluate all that it must weigh. Relying only on the descriptions of adversary counsel is insufficient to ensure that a defendant receives the due process and fair trial to which he is entitled under our Constitution. One cannot evaluate in a rule 403 context what one has not seen or read. Remind me of the date of that opinion. Curtin? Yes, Your Honor. Hold on one second. The magic of technology, I can pull it up. 2007. 2007. May 24th, 2007. On Bonk in San Francisco. Counsel, let me ask two questions related to Brenda's here. First of all, the district court did see the video. It just didn't see the video before he admitted it, but he did see it when the jury saw it. Am I right on that? Right, just as in Curtin, just as in McElmurray, and just as in Bonk. No, not as in Curtin, because the judge in Curtin never did read some of the materials. Right. They were never read. Those were written materials, the salacious, sex-oriented materials. The district judge read some of them and admitted others that he did not read and never read. That's true. So they were sent back so the district court could read them in the first instance. That's fair. So here we have a video that is seen by the judge. And presumably at that time, did you make a motion, a renewed motion to exclude this because it was gory? Trial counsel did not make a renewed motion, but of course the district court had already ruled, and McElmurray's- Presumably the district court could have said, oh my goodness, I think I've made a mistake here. Well, that would be a pretty difficult bell to unring, Your Honor. It would be, but it's at least possible, and it is interesting. I mean, it's something, I'm not sure exactly what it is, but that puts us on point error that you didn't move to, that somebody didn't move to say, Your Honor, now you've seen it for yourself, either enter some findings that we can challenge or tell us that this was a mistake. Candidly, Your Honor, I think that's an incredibly unfair burden to place on the defense, and it's contrary to what McElmurray said. It certainly would have been better for the district judge to have looked at this video. So it's something, it's not everything. Now, the second question related to prejudice is, I've seen the video. Right. Now, what do I do with that? What do I do if I don't think that it's particularly prejudicial or particularly extravagant or gory? Well, it's not extravagant or gory, but it is, I've seen the video too. I've been a defense lawyer for 15 years. I've seen a lot of gory footage. And to me, especially that part, especially the part right at the end when he's lying there, like there's that last moment where he's lying there and his hand just drops, and the phone is, like, falling out, and he shakes a little bit, and he stops moving altogether. Perhaps we have different tolerances, but that is a haunting image for me. You didn't object, you don't object or didn't object to the showing of some parts of the video that related to the other, to the two gals that were with him who also fell over in the parking lot. Am I right on that? Right. In our brief, we don't object. Object is not quite the right word. We agree that the government could have shown those. And it seems to me, from my viewing, that the reaction that they had to the fentanyl-laced cocaine was probably no more dramatic than it was for your client. So now you've got a jury that has seen sort of a type of what's going to happen, an exemplar of how your client might have responded. Right. And that's not, and you don't object to that. And that, I believe, cuts heavily in our favor. I think there's two points to that that cut heavily in our favor. And I'm glad you brought it up. So the first point is, one is fundamentally different than the other because she's sitting there in court. We know it turned out okay. We know the exact opposite happened. We hear this guy's wife take the stand and testify about the loss of her husband and her kids and those kinds of things. So the video has a very different impact other than the two women who they were, you know, thank God, brought back to life. Right. So there's one thing. And the other point is, so that's just kind of a human point, right, going to what the jurors would have, how they would have been impacted. But the legal point is that Your Honor just made the exact point, which the Supreme Court made in Old Chief, right, the government had lots of other ways that were less prejudicial to present the same point. And when there are lots of other less prejudicial ways to present the same point, we know as a matter of law from the Supreme Court that the Rule 403 prejudice, excuse me, the Rule 403 probative analysis cuts in our benefit, right. It's the law of diminishing returns. That's what the case law says. That's what Old Chief says. And you're also making the point that the judge had admitted the video and the only opportunity he had at that point was to watch it as the jury was watching. That's exactly right. I mean, but now for a long time, so had McElmurray, which is a decision out of the Southern District of California, the same court. So in words, this is not new law. This is not a brand-new judge. And he knew very well his obligation to watch that video. And he would still apply harmlessness error to this, right? Yeah. And returning, I've been thinking a lot about harmlessness error, the harmless error analysis in this context. Because as I delved into the case law, just watching my clock a little bit, but as I delved into it, it's a bit all over the place. And the government does an interesting thing. I hadn't really seen it before, but as I was reviewing it, I picked up on it. They kind of give you two layers of harmlessness. They first say, okay, so let's just assume it's curtain error, that he didn't watch it, which we all know that plainly it is. So then they say, well, it doesn't matter because it would have been admissible anyway. So it's harmless that way. And then they say, well, if it wouldn't have been admissible under 403, it's harmless because it wouldn't have impacted the verdict. Where I think the flaw is, is that kind of second, that first harmlessness thing, and I think this goes to Judge Ivey's point, what if he doesn't feel personally that it's that prejudicial? I don't think that's the way it's supposed to work under 403. I think what this court has said, and in fact what it said in Waters, was that it goes back to the district court for that determination in the first instance. And why is that? Why are we not just wasting our time doing that? And it's because once the proper balancing, I mean proper in the sense, the proper procedural balancing, right, once the court has read and reviewed it, the ultimate 403 determination we know is discretionary. But who gets to make that discretionary decision? This court reviews discretionary decisions, but it's not typically this court's purview to make the discretionary decisions. And that's a point that the court made very well in Mancinas-Flores, and I'll just quote from that. When we review for abuse of discretion, we necessarily review the district court's decision-making process, not simply whether the decision resulted in a permissible outcome. That's the direct quote from Mancinas-Flores. So here we know, as a matter of law under Curtin, the decision-making process was flawed. So the remand requirement is to get it right, right? That's what the precedent makes clear. And so what Waters said goes to Judge Bybee's point, and I'll quote again. Even if the record demonstrated an adequate analysis by the district court, we would be inclined to hold that admitting the evidence was abuse of discretion. But we need not reach this question, however, because the district court did not properly exercise its discretion. It didn't review the information. The district court admitted the articles without ever reviewing them. Our case law establishes that this was error. Here the district court admitted the video without ever reviewing it. This court's case law establishes that that was error. Then we go to the traditional harmlessness, which is, I think, your honor's question, and I took a long time to get there, so I apologize. But then we're just at regular harmlessness error, and we say, if this video had been excluded, we can either send it back conditionally, as the government suggests in its footnote, for a conditional hearing on 403. And we would welcome that opportunity, because I'm confident we would win that. But if not, then we do the traditional prejudice harmlessness. We say, if this hadn't come in, what's the impact? And our argument is it's a cumulative error analysis. But I think that it's, you know, the government makes a lot about overwhelming evidence in this case, and I just don't think that's true, especially... If you can switch gears and address the hearsay issue. Yes. I'm trying to understand the scope of statement against, you know, penal interest. So think of this hypothetical. Someone, the criminal defendant, hires Hitman to kill somebody. Hitman later becomes deceased, so they're texting each other. Okay. So the text says, the Hitman text says, I will kill the guy outside of Denny's tomorrow. That's clearly admissible as a statement against interest, right? Correct. Then there's another text that says from the Hitman saying, all right, I'm outside Denny's. Is that admissible as a statement against interest? Yes, probably. So we do have to kind of look at the context, because it's not, you know, it's not a crime against interest to be outside of Denny's. So we do have to look at it in context with other, you know, tax other statements against interest to see if another statement is a statement against interest. Right, but I think the key part of your, and I know where your honor is going with this, and I think the key part of what your honor is, there's two key parts of what your honor is, hypothetically. Number one, that is already, the federal crime has already been committed, right? I mean, we know that that would be, assuming there's some state lines, that would be a conspiracy to commit murder for hire, right? That has already been admitted, right? So that's the context that's very important. The other point is that what your honor is hitting on is what the case law says. This is a fact-intensive inquiry. Who performs fact-intensive inquiries? The district court does. This argument wasn't raised below. It wasn't argued that it was admitted as a statement against interest. If I could just go back a little bit to what the court actually said, it's at page ER-8. He's talking to defense counsel. The text, you move to exclude text ostensibly to your client from JC. That is JC's text. That is Mr. Chambers, the decedent's, the non-party opponent's text. That's what he's talking about. The court's ruling on that is that should be denied. The statements are non-hearsay. It's a statement of a party opponent. Did he just explain that? No. It's just wrong. It's obviously not a statement of a party opponent. This was not admitted for context. And then the whole issue of limiting instructions was out the window. Exactly. That's exactly the point. Well, you're motivated better than me, and I see I'm over my time. I have a couple questions. I just want to make sure I'm focused on the right thing. We're looking at the trial exhibits 27, 28, 29. Is that right? For the text messages? Yes. ER's 802 to about 805. We are looking, yes. And the ones from the night of are 802, 803. And so what you would like to do is just exclude everything that's from Chambers. Is that correct? From Chambers to Davis. Those are non-party. Those are not statements of a party opponent. That's our argument. Right. And so you would allow the texts that were from your client to Chambers? It could have come in. It could have happened several ways. So obviously my statements, the yellow statements, does Your Honor have color copies? I don't. Okay. So the ones that – I'm just trying to look over your bench, Your Honor, and see your photocopies. You can't do that. I know. I'm trying. Okay. I can. So the lighter colored ones, those are mine. The one that's like that, do you see that one, Your Honor, on 802, I believe? It's from 1220. Okay. Yes. That's from Davis. So anything from Davis to Chambers is admissible. Everything from Chambers to Davis is inadmissible. For the truth of the matter, sir. Right. Right. Right. Okay. So, for example, Chambers to Davis, would you happen to have a beer for me when I get there, would be inadmissible. For the truth of the matter, sir. Okay. So it looks to me like there's not much to these texts except for from Chambers to Davis, did you get a price. Now it looks like that's dangerous. Here's what's really dangerous from my perspective. If I can get you to go back to 802, Your Honor. Yes. Here's what comes in for the truth of the matter, sir. From Chambers. On the night in question. On my way to Channel 2. I think, without too much hyperbole, that was the best and most important evidence for the government. In this whole entire case. Why? Because that's the message that says Chambers is meeting Davis at Channel 2 at the bar on that night. That is the only thing, that direct evidence that ties them. That was admitted for the truth of the matter. It can't be context because there's no response. That, to me, is the whole enchilada. How long did this trial take? This trial took two days. There were two days of evidence with closing on the third. So this is, if I can kind of end with this. It's not a two month trial. The trial here was short. There was just two days of evidence. But the penalty here was anything but. Mr. Davis is someone with zero criminal history points. He's in jail for 20 years because a jury found he sold his friend. And everybody agrees they're friends. They had purchased cocaine from the same source before and used it without, and it wasn't laced with fentanyl. That's what the testimony from Ms. Pugh established in Ms. Lester. They couldn't ID my client. That's another huge part, even though they said they saw his face clearly on the night in question when the drug dealer, whoever that was, delivered the beer. But talk about harmlessness. You have two people who say they met this drug dealer. And not one of them could identify my client. Not one. So, counsel, I'm on page 805. I've got a message here from Davis to Chambers. Okay. Bear with me one second, Your Honor. Okay. I'm here. 805. Yes. Middle of the page. Yes. To Chambers. Got you and working on better price. As well, you can head to channel 2 bar by my pad. Right. There's the channel 2 from Davis. Look at the date, Your Honor. So what's with the date? It's 12-4. Yes. So this is two weeks before. It does put him offering a good price at channel 2, but two weeks before. And then when you combine two weeks before with the fact that on the night in question, the woman in the car with him says, an African-American came up, sold the drugs, delivered the beer. I got a good look at his face when he sold the beer, and I couldn't identify Mr. Davis. Not only can't she identify him, she gives the totally wrong description. She says a guy was a medium guy with a strong build, and my client, respectfully, is not that. He's heavily overweight. So all of those things combined, we have clear errors. We have a 20-year sentence. We have a two-day trial. Let's get this right. Thank you. Thank you. Do you have a minute? No, I'm way over, Your Honor. Good morning, Your Honors. Jacqueline Stahl for the United States. There's been a lot of discussion about harmlessness, so I want to start there. Jacqueline asked the judge to review the video. It does not appear from the record. Why not? Why didn't they do that? I know it's outside the record. Your trial counsel assures me that it did happen outside the presence of the court reporter. It's not in the record. So we will admit that based on this record, it does not appear the judge watched the video until it was shown at trial. So looking at that, even if the judge did not watch the video, it's harmless for two reasons. This court can decide the 403 issue. In a case like this where there are real victims, family members who sat through the trial, sending this back wouldn't be something this court can decide. We would encourage the court to do so, and we have watched the video. The video is admissible because exclusion under 403 is not. That's not the point. The point is that this circuit has very clearly said that there's a process that must be followed before videos of this type can be admitted. And is there any serious argument that the process mandated by the decisions of this court was simply not followed? From this record, I acknowledge, no, it was not watched before it was shown to the jury. In fact, why aren't you conceding for retrial? Let me hear your arguments. The video was clearly admissible. Exclusion under 403 is an extraordinary remedy. This video was probative of the cause of death. The government had to prove beyond a reasonable doubt that Chambers died of a fentanyl overdose. You can't tell from that video what the poison was. That was the testimony from the physician, wasn't it? Yes, Your Honor, and there was conflicting testimony, and therefore the jury had to. Conflicting testimony about whether the guy was still alive. What was the conflicting testimony? About how he died. And so the government's theory was he died from the fentanyl. Ms. Fuller put a toxicologist on the stand. It was an expert in emergency medicine who testified that seeing how people are behaving immediately before they collapse of an overdose is highly relevant, and their expert did not watch the video. The video shows how these people are behaving up until they collapse. They're not agitated. They're not up. They're not acting in a way consistent with cocaine. What did your toxicology report show, and what was the toxicology testimony? That there was fentanyl in its metabolites, that there was cocaethylene, which is, as their expert testified, a combination of cocaine and alcohol, and there was cocaine. There was no alcohol found. So their theory, their defense expert, who was asked to find alternate causes of death besides the drugs, said that it was cocaethylene, which was cocaine and alcohol. So the government had to prove, beyond a reasonable doubt, that Chambers died of an opioid overdose, because that's what was part of an overdose of either cocaine or fentanyl, because that's what was distributed. So here there was evidence that the dealer at the Channel 2 bar gave a dime baggie of white powder. That white powder was later tested for cocaine and fentanyl. And then our expert's testimony was he died of a fentanyl overdose. If the jury had believed their expert, they could have decided that we failed to prove the drugs killed him, the drugs found in his car and the drugs sold by the dealer. The jury could have said, no, it was cocaethylene. It's because he drank alcohol and did cocaine. Therefore, the government would fail to meet its burden on that element. So here, where you had Hugh testify that Lester was having a seizure, and you had defense counsel arguing that Chambers had a seizure, and so the testimony was a seizure might be cocaine-related, but our expert testified that this was opioid-related. It was lack of oxygen causing nonrhythmic moving of the body. So Davis concedes that video of the two women was admissible. The video in question is 2 minutes and 28 seconds, and Chambers did not begin to stumble or collapse until 20 seconds to the end of the video. It does not show him dying. We cut off the video before paramedics arrive. There is no attempt at life-saving measures seen, and he is pronounced dead at the hospital over an hour later. Look, I'm going on 80 years old. I've never seen a video like that. Your Honor, I would liken this to a child pornography case where the government has to show the videos are pornography. Here we had to show beyond a reasonable doubt that he died of a fentanyl overdose. There was conflicting testimony in what he looked like as he was dying. Their expert said seizure. Our expert said no seizure. Their expert didn't watch the video. Our expert watched the video. The jury, as the ultimate fact finder, needed to see the video to make that contested determination. And there is no distinguishing the video of Lester collapsing and being on the ground and Pew collapsing. There's no reason to treat the 20 seconds of Chambers reacting to the drugs any differently. But even if this court were to believe that the video should not come in, it was harmless and did not materially affect the verdict. The evidence here was overwhelming. Pew and Lester said around 1 a.m. on December 21st, Chambers was seeking additional cocaine. Pew testified, and there were text messages showing she agreed to contribute $20. They exchanged money outside the Quarterdeck bar. She said the dealer's name was Perry, that she had gone with Chambers before to meet Perry at the Channel 2 bar to buy cocaine. She said on that night, Chambers was going to Perry and Claremont, where the Channel 2 bar is. Lester testified around that time. She heard Chambers say, I know someone who can get us cocaine. I'm going to call him. We then have the call logs, a call from Chambers to Davis. So if we completely ignore the substance of the text messages, there are calls and communications between the two. At this exact time, two witnesses, Lester and Pew, say he's going to obtain cocaine. Lester then saw him make the phone call, and Lester went to the Channel 2 bar with Chambers. And there we have other evidence that Davis was there as well. There was the cell phone mapping evidence that showed Chambers moving from the Quarterdeck bar to the Channel 2 bar. The expert then testified that Davis moved at, or about, or past his house to the Channel 2 bar. And, yes, the mapping expert testified, this is not GPS. I can't tell you 100% sure, but in my opinion, Davis was at the Channel 2 bar. He left his house. His little dot did move. What did the government say when the trial judge said these texts were party officials? This was ‑‑ we did not correct him, Your Honor. There was a ‑‑ Why not? I was in trial counsel. This is first year evidence. Well, Your Honor, the ‑‑ Why didn't the government take a position on that? The government did argue that these were context, and our motions eliminate page 31 of the record. And so, yes, the district judge said these are statements of a party opponent, asked to apply to Chambers. That is incorrect. But this court can affirm on any ground supported by the record. And these were context. You look at ‑‑ But there were no limiting instructions, right? There was no limiting instruction asked with respect to the text messages. But the importance of the text messages ‑‑ It was entitled to a limited instruction if it was not hearsay. Isn't that right? Your Honor, here where even counsel shows there's very limited substance to the messages from Chambers, here 20 minutes away, and I understand there was a message that said heading to the Channel 2 bar, but there was an abundance of evidence that these two, Davis and Chambers, met at the Channel 2 bar. It's a half a mile from Davis' house. This was where they met up to do a sale of drugs. So if we ‑‑ and the government's argument in closing was look at the chronology of these messages. What was important about these messages was that they were communicating. With respect to December 20th, the night immediately prior to Chambers dying, they are discussing meeting up, and the government said whether or not they met up is completely irrelevant. It is not before you. This is them communicating. This is identity of Davis. And my colleague says in his briefing repeatedly that this number was supposedly linked to Davis. That was conclusively proven. The government showed at trial that Davis had filed a police report previously with this phone number. When they searched Davis' house, they called that phone number and confirmed it was his phone. And if we look at the search of the house, that's further evidence of Davis' involvement in this case. They went to search ‑‑ to search the search warrant, and he slammed the door in their faces, showing consciousness of guilt. They then searched the house and found drug sale paraphernalia. They found dime baggies that matched exactly the leftover drugs in Chambers' house. They found a Michelob Ultra beer can, which matched the beer can found in Chambers' room, or in Chambers' car. They found trace amounts of fentanyl and cocaine. There's also multiple, I believe it was nine or ten phone calls from Davis in the hours after Chambers died. And the jury reasonably could have found that once Davis learned of the cocaine and fentanyl he was reaching out to whom he had sold the drugs to, which the police said their priority was finding the dealer to get these dangerous drugs off the street. And this goes to the jury instruction. The government did not have to prove that Davis knew it was fentanyl. We can acknowledge that he may have believed he was selling cocaine, but cocaine and fentanyl are scheduled to drugs. They are dangerous. They can cause death. And that is what happened here. So looking at this evidence, there are two eyewitnesses, Pugh and Lester, who are testifying as to the drug dealer. Does the government think this was a fair trial? Yes, Your Honor. And as to your point about the speed of this trial, this district judge is known for being lightning fast. And, in fact, multiple times in the record says, keep it moving, keep it moving. But the government put on 16 witnesses, 40 exhibits. So the transcript is 550 pages. So while I believe two days is misleading, this was a fulsome trial. Two days. I think two days previously. Sixteen witnesses, Your Honor. You all are very good. I apologize? You all are very good. You're efficient. That's why the 403 error and the evidentiary error are mystified. When we look at the other evidence, we believe that this is harmless and did not affect the verdict. I don't believe I fully answered your question on the text messages. So just to wrap that up, again, the government argued these are for chronology. And when you look at the context of Chambers' messages, he's saying things like leaving 20 minutes away. Those were irrelevant. Even on the December 20th, he said, on my way, 20 minutes away. The defense asked the detective, what do you think 20 minutes away means? And he said, I don't know. I can't decide that without other evidence. So it wasn't for the truth of the matter asserted here. And while eliminating instruction is one piece of the harmlessness argument, it is not the whole ballgame. Does the record show why the judge was in such a hurry? It is routine for this judge in our district. It is the way this practice goes. So if we look at the Valerio case as to the text messages, there the informant's half said, I'm a felon. His side of the conversation, I'm a felon. That was an element of the crime, selling a firearm to the felon, and you have the informant's statements coming in saying, I'm a felon. But the court said, that is not for the truth of the matter asserted because other independent evidence showed he was a felon. Here, whether Chambers was on his way, whether he was at Channel 2, whether he was 20 minutes away, whatever the text messages said, independent evidence established that he went to the Channel 2 bar, that Davis was there at the same time, that they were communicating at that identical time. There was no other evidence for the jury to reasonably find that there was some other drug dealer involved. And so here, this court can be assured that either error was harmless. Does the court have any further questions? I don't understand quite your contention about the video being harmless, because you were telling us two or three minutes ago about how critical it was, how important it was, because if one of the victims is lying and cringing, in one position it might be fentanyl, in another position it might be cocaine, and your learned opponent has shared with us his views about how upsetting parts of it were. So I don't understand how you can have it both ways. It was harmless video, but it was critical testimony according to you, and upsetting, troubling testimony according to your adversary. Your Honor, because probative evidence is always prejudicial, but 403 requires that the probative value be substantially outweighed by unfair prejudice or cumulative presentation of evidence. Full confessions are extremely prejudicial. Probative evidence always is. But here, the question is whether it was unfair prejudice. And so, as in child pornography, those videos are very upsetting, but they come in. My voice is elusive. The videos like this don't come in unless they're vetted first. You may be absolutely right, but there's just no ambiguity in this circuit's law about the procedures that must be followed, and they have to be followed whether a judge is in a big hurry or whether a judge is not in a hurry. This statute has a 20-year sentence. You can look through it. You can spend the rest of today looking through it for Title 18 and won't find a statute that carries penalties like this. Why does the government object to having this done correctly, considering the consequences? Your Honor, two points on that. The first would be if this court declines to do the 403 balancing on its own, we would ask for a conditional remand where you remand for the district court to watch the video and only vacate. If they were to see the video now, what good would that do? Because he saw it before he admitted it, and he watched it along with the jury, so he knows what the video is. Maybe I'm misunderstanding your point. I thought your question was. . . I thought you were suggesting that we remand it so the judge can look at the video. If your concern is that the judge did not follow the procedures from Curtin and make the admissibility finding. . . That he violated the law and admitted the video. That's my concern. Then we would ask that you remand for him to watch the video and say. . . He watched it, though. That's a meaningless prophylactic. So in the remand you envision, you would vacate the verdict and direct that this video does not come in. Is that correct? It would go to a new trial, a fair trial. My argument on that would be, my colleague concedes that the video of the two women comes in, and the judge never watched that before trial either. So treating these 20 seconds differently and putting this family through an additional trial where the overwhelming amount of evidence. . . He didn't get the 20 years for the two women. He got the 20 years for the men. For the resulting in death, yes. Big difference, isn't it? There were three victims in this case. The two women did overdose and have to be revived by Narcan. So yes, they were not resulting in death, but he did distribute the cocaine to. . . And all three of these individuals used it. We would respectfully ask that this court adjourn. Thank you. Thank you, Your Honor. For the extra minute, I'll just make three quick points. Number one, as Chief Justice Roberts once wrote, some poisons or some toxins can be deadly in small doses. 20 seconds, 30 seconds, it doesn't matter. This is a very disturbing video. It was admitted improperly in violation of the law. Your Honor's point about the government's argument, they can't have it both ways, talking about how important it was. And to be clear, this is mostly a red herring. Nobody said the expert couldn't watch the video. The point is for the jurors. The expert could watch it, describe it, and make his conclusions based on it. That's a red herring argument. It's the jurors that don't. The second part, there's a suggestion there's no other person who could have been the drug dealer. That's just not true. There were two men present on the night in question in the car, and the only one he couldn't identify was the defendant, my client. She saw him. She couldn't identify him. What's the common sense? It was the other guy who sold it. That guy was also present at the house during the search. So there's plenty of third-party culpability possibility. Finally, this whole thing about the mapping expert said he was at the Channel 2 bar. ER 525, defense counsel specifically asked, sir, you can't say whether he was at, this is Mr. Davis, whether he was at his house or whether he was at the Channel 2 bar. Correct. The mapping expert doesn't put him at Channel 2. He says he was in the vicinity. The errors were not harmless. Let's get it right. Let's not put a man in jail for 20 years where we know there were errors. Thank you. Thank you both for that. Thank you both. Well argued. We gave you a hard time, but that's our job. Thank you. The case has been submitted.
judges: Parker, BYBEE, LEE